IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-00718-PAB-NRN

AUTOTECH TECHNOLOGIES, LP d/b/a EZAutomation,

     Plaintiff,

v.

PALMER DRIVES CONTROLS AND SYSTEMS, INC. and
LYNN WEBERG,

     Defendants.

_____

**ORDER**
_____

     This matter is before the Court on defendants' Motion to Dismiss Amended

Complaint [Docket No. 23] pursuant to Fed. R. Civ. P. 12(b)(6).  The Court has

jurisdiction pursuant to 28 U.S.C. § 1332.

## I.  BACKGROUND

     Plaintiff Autotech Technologies, LP manufactures electronics products, including

industrial automation controls, under the trade name EZAutomation.  Docket No. 20 at

2-3, ¶¶ 1, 7.[1]  Green CO2 Systems ("Green") manufactures carbon dioxide detection

and treatment equipment for the food service industry.  *Id*. at 4, ¶ 15.  Green set out to

develop a new control for its carbon dioxide equipment (the "CO2 control").  *Id*., ¶ 16.

Green contacted plaintiff to see if it could supply products for use in Green's CO2

_____

[1] Facts in this section are drawn from plaintiff's amended complaint, Docket No.
20, and are presumed to be true for the purposes of the motion to dismiss.  *Brown v.
Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

control. *Id*., ¶ 18.  Plaintiff's president, Vikram Kumar ("Kumar"), established a

relationship with Green's owners and convinced them to use plaintiff's products. *Id*.,

¶ 19.  On July 26, 2017, Green purchased prototype quantities of plaintiff's products

from plaintiff, and agreed to a discounted price for 1,000 "units" to be sold by plaintiff

"as a start." *Id*. at 5, ¶ 20.

In some circumstances, plaintiff's customers use a vendor to assist with

programming plaintiff's products if they are not well-versed in programming. *Id*., ¶ 23.

While plaintiff sometimes provides this service itself, in other situations plaintiff

engages a programming service provider, also known as a system integrator, on the

customer's behalf. *Id*. ¶ 24.  Plaintiff alleges that the industry norm is that, if a

manufacturer engages a system integrator for the benefit of a customer, the system

integrator is "always loyal" to the manufacturer and promotes only the manufacturer's

products. *Id*.

On August 10, 2017, plaintiff met with defendant Palmer Drives Controls and

Systems, Inc. ("Palmer") and its president, Lynn Weberg ("Weberg"), to discuss the

possibility of Palmer becoming a system integrator for plaintiff in Colorado. *Id*. at 3, ¶ 3,

and at 5-6, ¶ 26.  At the meeting, Palmer assured plaintiff that it would follow "the

[system integrator] norm in the market" and plaintiff's "policy" requiring use of plaintiff's

products for customers brought to Palmer by plaintiff. *Id*. at 5-6, ¶ 26.  Palmer also

represented that it would have an employee dedicated to learning plaintiff's products

and relevant programming. *Id*.  On August 11, 2017, Kumar emailed defendants to

follow up. *Id*. at 6, ¶ 27; Docket No. 20-1.  In response, Weberg stated that he would

"commit to [plaintiff] that [Palmer would] get staff trained on your product" and that Palmer "would appreciate the opportunity to earn [plaintiff's] business and trust." Docket No. 20 at 6, ¶ 29; Docket No. 20-1.

On September 1, 2017, plaintiff introduced Palmer to Green via email. Docket No. 20 at 7, ¶ 31; Docket No. 20-2. In the email, plaintiff described Palmer as plaintiff's "local SI partner." *Id.* On October 12, 2017, plaintiff, Palmer, and Green had a conference call to discuss details. *Id.* at 7-8, ¶ 35. Following the conference call, a Palmer employee emailed plaintiff and requested "info on the enclosures and any other components that you may have specified for" the $CO_2$ control project. *Id.* (emphasis removed); Docket No. 20-3. On December 8, 2017, plaintiff met with Green in Colorado. Docket No. 20 at 8, ¶ 38. During the meeting, Green "confirmed" that it would be moving forward using plaintiff's products in the $CO_2$ control. *Id.* Green also provided plaintiff with a "project report" listing EZAutomation as a supplier. *Id.*

On December 11, 2017, Weberg sent Kumar an email indicating that there was "some confusion about who is buying what and building what" related to the $CO_2$ control. *Id.* at 8-9, ¶ 39; Docket No. 20-4. On January 11, 2018, Weberg emailed Kumar and advised him that Green would be using products from one of plaintiff's direct competitors, Unitronics, instead of plaintiff's products in the $CO_2$ control. Docket No. 20 at 9, ¶ 43; Docket No. 20-5. In the email, Weberg stated that "it was determined that there were several features that [Green] wanted that [plaintiff's products] would not handle," that Palmer was "asked to research alternative systems," and that "it was determined that Unitronics provided a superior solution" for the $CO_2$ control. Docket

No. 20 at 9, ¶¶ 44-45; Docket No. 20-5 at 4-5.  Plaintiff maintains that its products do possess the features required for the $CO_2$ control.  Docket No. 20 at 10, ¶ 49.  In a follow-up email, Palmer employee Dallas Trahan ("Trahan") indicated that he had worked with Unitronics in the past.  *Id*. at 10, ¶ 50.  Green currently sells the $CO_2$ control using Unitronics products, which Palmer supplies to Green.  *Id*. at 12, ¶ 63.

On March 11, 2019, plaintiff filed this lawsuit.  Docket No. 1.  In the operative complaint, plaintiff claims that defendants engaged in a "scheme" to "make their pockets richer" by "betray[ing]" plaintiff.  Docket No. 20 at 12, ¶ 60.  Plaintiff asserts five claims for relief against both defendants: (1) tortious interference with business relations; (2) tortious interference with prospective economic advantage; (3) breach of fiduciary duty – duty of loyalty; (4) breach of fiduciary duty – duty of care and disclosure; and (5) fraud.  *Id*. at 12-22.  Plaintiff brings an additional fraud claim against Weberg only and claims for unjust enrichment, breach of contract, and promissory estoppel against Palmer only.  *Id*. at 22-27.  On May 24, 2019, defendants filed a motion to dismiss.  Docket No. 23.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the

pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal

quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A

plaintiff must nudge [his] claims across the line from conceivable to plausible in order to

survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's

allegations are "so general that they encompass a wide swath of conduct, much of it

innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191

(quotations omitted).  Thus, even though modern rules of pleading are somewhat

forgiving, "a complaint still must contain either direct or inferential allegations

respecting all the material elements necessary to sustain a recovery under some viable

legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration

marks omitted ).

## III.   ANALYSIS

Defendants move to dismiss the complaint in its entirety.  Docket No. 23.  The

Court considers each claim in turn.[2]

### A.   First and Second Claims – Tortious Interference

Plaintiff's First and Second Claims are brought against both defendants for

"tortious interference with business relations" and "tortious interference with

prospective economic advantage."  Docket No. 20 at 12-14.  The two claims are

different forms of the tort of interference with existing or prospective contractual

_____

[2] Both parties assume that Colorado law governs plaintiff's claims.  The Court
will likewise assume that Colorado law governs the claims. *Cf. Grynberg v. Total S.A.*,
538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that
Colorado law applies, we will proceed under the same assumption.").

relationships. *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo. App. 2009) (citing Restatement (Second) of Torts ch. 37 introductory note (1979)).  "The tort of interference with existing . . . contractual relations" is also referred to as "intentional interference with contract."  *Compare id*. *with Krystkowiak v. W.O. Brisben Companies, Inc.*, 90 P.3d 859, 871 (Colo. 2004) (both citing Restatement (Second) of Torts § 766).

### 1.  *Intentional Interference with Contract*

To be liable for intentional interference with contract, a defendant must "(1) be aware of a contract between two parties, (2) intend that one of the parties breach the contract, and (3) intentionally and improperly induce the party to breach or make it impossible for the party to perform the contract."  *Krystkowiak*, 90 P.3d at 871; *Warne v. Hall*, 373 P.3d 588, 595-96 (Colo. 2016); *see also* Restatement (Second) of Torts § 766.  "[A] valid contract must exist" to sustain a claim for intentional interference with contract.  *Condo v. Connors*, 271 P.3d 524, 526 (Colo. App. 2010); *see also Grimm Const. Co., Inc. v. Denver Bd. of Water Com'rs*, 835 P.2d 599, 601 (Colo. App. 1992) (describing "the existence of a contract between the plaintiff and a third party" as an "essential element" of intentional interference with contract).

Defendants argue that plaintiff fails to state a claim for intentional interference with contract because the complaint does not adequately allege the existence of a contract between plaintiff and Green.  Docket No. 23 at 7-10.  The essential elements of a contract are "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation."  *Peterson v. Trailways, Inc.*, 555 F. Supp. 827, 830 (D. Colo. 1983) (citing *Denver Truck Exch. v.* Perryman, 307 P.2d 805, 810 (Colo.

1957).  A contract can be either express – manifested by either written or oral words –

or implied – manifested by conduct.  *Fair v. Red Lion Inn*, 920 F.2d 820, 825 (Colo.

App. 1995).  "In both cases, a contract is created by the meeting of the minds to

contract with each other."  *Osband v. United Airlines, Inc.*, 981 P.2d 616, 621 (Colo.

App. 1998).

Plaintiff is less than clear as to which type of contract it believes existed between

it and Green, instead pointing generally to certain allegations in its complaint.  Green

wanted to develop a new $CO_2$ control and anticipated that it would sell "many

thousands" of the $CO_2$ control every year.  Docket No. 20 at 4, ¶ 16.  Plaintiff

"convinced" Green to use plaintiff's products.  *Id.*, ¶ 19.  On July 26, 2017, after

receiving a proposal from plaintiff, Green "purchased prototype quantities" of plaintiff's

products.  *Id.* at 5, ¶ 20.  The parties "mutually agreed" to a discounted price "for 1000

units as a start."  *Id.*  Green referred to the development of its $CO_2$ equipment as a

"[p]roject" and prepared a report listing plaintiff as its "exclusive vendor" for certain

products.  *Id.*, ¶¶ 21-22.  Plaintiff and Green "decided" that plaintiff would engage a

systems integrator.  *Id.* ¶ 25.  On September 1, 2017, plaintiff introduced Palmer to

Green via email.  *Id.* at 7, ¶ 31. The parties worked with Green to "navigate[] the scope

of the project and work[] towards a start date."  Id. at 8, ¶ 36.  On December 8, 2017,

Green "confirmed" with plaintiff in an in-person meeting that Green would be moving

forward "using [p]laintiff's products only" and provided plaintiff with a "long project

report."  *Id.* ¶ 38.  On December 11, 2017, plaintiff told Palmer that Green had "special

pricing" from plaintiff.  *Id.* at 9, ¶ 40.

The allegations in the complaint are insufficient to establish that plaintiff and Green entered into a valid express or implied contract.  An express contract requires either a written or oral agreement that manifests, among other things, "a legal consideration, mutuality of agreement, and mutuality of obligation."  *See Peterson*, 555 F. Supp. at 830.  There is no allegation in the complaint that plaintiff and Green entered into an oral or written agreement that manifests these elements.  Although plaintiff seems to contend that it entered into a written agreement with Green on December 8, 2017, the cited portion of the complaint does not contain such allegations.  *See* Docket No. 20 at 8, ¶ 38.  Moreover, the project report from that date, which plaintiff attached to its complaint, does not support the existence of a contract.  *See* Docket No. 20-8; *see also Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit . . . may be considered in a Rule 12(b)(6) dismissal.").  Rather than an agreement between Green and plaintiff, the project report appears to be an internal document of Green.  Although it lists plaintiff as a "vendor" and plaintiff's products as "key components," it states that such designation is "subject to change" and includes a requirement that "[v]endors submitting proposals . . . must do so in written digital form."  *See* Docket No. 20-8 at 2-4.  There is no reason to infer that the project report, which is more akin to a proposal than an agreement, is evidence that a contract was agreed upon between plaintiff and Green.  Tellingly, both the complaint and plaintiff's response do not explain what plaintiff promised Green and what Green promised in return to establish the alleged contract, with the possible exception of the allegation that Green purchased "1000 units" of plaintiff's product at a

discounted price.  *See* Docket No. 20 at 5, ¶ 20.  However, even assuming that

allegation is sufficient to establish an express contract between plaintiff and Green,

there is no basis in the complaint to infer that this contract was breached, as opposed

to a separate agreement that would, as plaintiff claims, require Green to purchase "at

least $720,000 worth of [p]laintiff's products annually . . . for at least ten years to come."

*See id*. at 13, ¶ 67.[3]

The case for an implied contract is even weaker.  "Implied contracts arise from

conduct of the parties which evidences a mutual intention to contract with each other;

however, there must be a meeting of the minds before any contract will be implied."

*A.R.A. Mfg. Co. v. Cohen*, 654 P.2d 857, 859 (Colo. App. 1982).  Here, Green's

conduct, as alleged in the complaint, does not support an inference that Green had

come to a meeting of the minds with plaintiff that could support the existence of an

implied contract.  While plaintiff may have subjectively believed it entered into a

contract with Green, the question of mutual assent is "determined by an objective test,

rather than the subjective intentions of the parties."  *See* 1 Williston on Contracts § 3:4

(4th ed. July 2019 update).  The allegations that Green's preparation of reports,

--------

[3] Plaintiff's claims are inconsistent as to how much it expected to receive from Green.  *Compare* Docket No. 20 at 13, ¶ 67 (claiming a contract for "at least $720,000 worth of [p]laintiff's products annually . . . for at least ten years to come"), *with id*. at 14, ¶ 81 (asserting that plaintiff "anticipated receiving approximately $1.5 million per year . . . for at least ten (10) years").  No factual allegations in the complaint support either assertion.  Moreover, as defendants point out, Colorado's Statute of Frauds would require that any "contract for the sale of goods for the price of five hundred dollars or more" be evidenced by "some writing sufficient to indicate that a contract for sale has been made between the parties" in order to be enforceable.  Colo. Rev. Stat. § 4-2-201(1).  However, the Court need not reach the application of the Statute of Frauds in order to resolve plaintiff's claim.

description of its work with plaintiff as a "project," and work with defendants to engage a systems integrator fail to objectively indicate Green's intent to assent to a contract with plaintiff, particularly when Green's own project report from the December 8, 2017 meeting indicates that vendor proposals must be made in "written digital form" and that "[v]erbal requests [from vendors] should not be accepted."  *See* Docket No. 20 at 5, ¶¶ 21-22 and 25; Docket No. 20-8 at 4.  Thus, the complaint does not establish the existence of an implied contract between plaintiff and Green that defendants could have breached.

Because the complaint fails to adequately allege the existence of a contract between plaintiff and Green, the Court will grant defendants' motion to dismiss as to plaintiff's first claim.[4]

### 2.    *Tortious Interference with a Prospective Business Relation*

"Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract."  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995).  Defendants argue that the complaint fails to show that their interference with the relationship between plaintiff and Green was improper.  Docket No. 23 at 11-12.  Courts consider seven factors in determining whether intentional interference is improper: the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the

---

[4] The Court does not reach defendants' arguments that plaintiff failed to allege (1) the breach of a contract between plaintiff and Green and (2) that defendants acted improperly in causing the breach.

freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties. *Amoco Oil*, 908 P.2d at 500 (citing Restatement (Second) of Torts § 767); *see also SGS Acquisition Co. Ltd. v. Linsley*, No. 16-cv-02486-MSK-KLM, 2018 WL 1456272, at *3 (D. Colo. Mar. 23, 2018).

The Court finds that the complaint adequately states a claim that Palmer's conduct was "improper." As to the first factor, which is described as a "chief factor," improper interference may be shown by, among other things, a defendant violating recognized ethical codes or business practices. Restatement (Second) of Torts § 767, cmt. c. Here, plaintiff alleges that the "norm in the market" for manufacturers of automation controls is that, if the manufacturer engages a system integrator (Palmer) for the benefit of a customer (Green), the system integrator "is always loyal to" the manufacturer. *See* Docket No. 20 at 5, ¶¶ 24, 26. Because the complaint alleges that Palmer failed to follow that norm, the complaint plausibly alleges improper interference as to the first factor. Relatedly, the second factor requires that plaintiff show that "interference with [its] contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767, cmt. d. It is also "important to ascertain whether the [defendant] was motivated, in whole or in part, by a desire to interfere with [plaintiff's] contractual relations." *Id*. The complaint alleges, somewhat conclusorily, that defendants intended to "eventually betray" plaintiff "in order to make their pockets richer." *See* Docket No. 20 at 12, ¶ 60. The Court can reasonably infer from the allegations in the complaint that defendants

were motivated, in part, by a desire to interfere with plaintiff's relations with Green; thus, the complaint plausibly alleges improper interference as to the second factor.

The complaint does not plausibly allege improper interference as to the third and fourth factors. The Restatement indicates that interference with a prospective contractual relationship is less likely to be improper than interference with an existing contract. *See* Restatement (Second) of Torts § 767, cmt. e. As discussed, plaintiff had a prospective contractual relationship with Green, not a firm contract. Similarly, Palmer's interest is not an improper interest because generally an economic interest "will normally prevail over a [plaintiff's] similar interest . . . if the actor does not use wrongful means." *See id.* cmt. f. Plaintiff does not indicate what "wrongful means" Palmer employed.

As for the fifth factor, the social interests do not weigh strongly in either direction. The sixth factor weighs in plaintiff's favor, as the complaint alleges that Palmer's actions led directly to Green ending its business relationship with plaintiff. Finally, the seventh factor is neutral. On the one hand, plaintiff and Palmer appear to be competitors for Green's business, which suggests propriety. *See id.* cmt. i. On the other hand, plaintiff alleges that Palmer was under an obligation to only use plaintiff's products, which suggests that Palmer redirecting business from plaintiff to Palmer is improper. *See id.* Taken together, the Court finds that plaintiff has alleged facts which, if true, would demonstrate that Palmer's interference was improper.

However, the Court agrees with defendants that the complaint fails to state a claim against Weberg personally. A corporate agent who, "while acting within the

scope of official duties, causes his or her principal to breach a contract generally will not be held liable for tortious interference with that contract." *W.O. Brisben Companies, Inc. v. Krystkowiak*, 66 P.3d 133, 136 (Colo. App. 2002). A corporate agent will not be liable if "the agent acted, in part at least, to serve the corporation's interests," as opposed to if "the agent was motivated out of personal animus towards one or both of the contracting parties." *Id*. (internal quotations omitted). Here, there are no allegations in the complaint that indicate that Weberg was motivated by personal animus against plaintiff. Plaintiff does not identify any source of personal animus motivating Weberg; according to the complaint, plaintiff and its principal had no prior relationship with Palmer or Weberg before the events described in the complaint. While plaintiff suggests that "motivation is a question of fact," it is plaintiff's burden to allege facts which, taken as true, would demonstrate that Weberg acted entirely out of personal animus. *See* Docket No. 31 at 16. The reasonable inference that can be drawn from the complaint is that Weberg acted, at least in part, out of a desire to serve Palmer's interests. *See* Docket No. 20 at 12, ¶ 60 (alleging that defendants' "scheme" was to obtain Green's business at plaintiff's expense). Thus, the Court will dismiss plaintiff's second claim against Weberg only.

## B.  Third and Fourth Claims – Breaches of Fiduciary Duty

Plaintiff's Third and Fourth Claims allege that defendants are liable for breaches of separate fiduciary duties: the duty of loyalty (Third Claim) and the duty of care and disclosure (Fourth Claim). Docket No. 20 at 16-19, ¶¶ 94-115. Defendants move to dismiss both claims on the basis that they owed no fiduciary duty to plaintiff. Docket

No. 23 at 3-6.

"The breach of fiduciary duty cause of action is a tort to remedy economic harm suffered by one party due to a breach of duties owed in a fiduciary relationship." *Accident & Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo. 2012); *see also* Restatement (Second) of Torts § 874. "A prerequisite to finding a fiduciary duty is the existence of a fiduciary relationship." *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Id.* (quoting Restatement (Second) of Torts § 874 cmt. a). "Fiduciary relationships that derive from a special relationship of trust, reliance, influence, and control are distinguishable from business relationships involving parties dealing at arm's length for mutual benefits." *Accident & Injury Med. Specialists*, 279 P.3d at 663. "[P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties." *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991).

Plaintiff argues that it entered into an agency relationship with defendants that gave rise to a fiduciary duty. *See* Docket No. 20 at 17, ¶ 99; Docket No. 31 at 6-9. Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo. 1987) (citing Restatement (Second) of Agency § 1(1)). The critical question is whether the parties "materially agree[d] to enter into a particular relation to which the

14

law attaches the legal consequences of agency, even though those consequences might not have been within the contemplation of the parties at the time of their agreement." *Id*.

The complaint fails to allege that defendants agreed to act subject to the control of plaintiff.  The complaint alleges that, in the first meeting between the parties, defendants "assured [p]laintiff that it would strictly follow . . . [p]laintiff's policy requiring use of [p]laintiff's products."  *See* Docket No. 20 at 5-6, ¶ 26.  However, there are no allegations in the complaint indicating that plaintiff and defendants ever agreed that defendants would be subject to plaintiff's control – even related to plaintiff's policy regarding the use of its products.  Instead, the complaint depicts arms-length bargaining between two parties for mutual benefit, which does not subject defendants to fiduciary duties.  *See Devery*, 944 F.2d at 730.  This conclusion is supported by an email exchange between Weberg and Kumar that is attached to the complaint.  *See* Docket No. 20-4.  In the email, Kumar states his "understanding" that Green would buy products "direct" from plaintiff and that Palmer would "be quoting project development and contract manufacturing services."  *See id*. at 1.  The email exchange, while it does suggest that plaintiff and Palmer may have had some element of coordination in their dealings with Green, does not support any inference that plaintiff had sufficient control over Palmer to indicate that Palmer was acting as plaintiff's agent.

Plaintiff's arguments to the contrary are unavailing.  First, plaintiff points to the allegation that plaintiff decided to "engage a suitable [system integrator]" as a result of the geographic distance between plaintiff and Green, but fails to explain why this

allegation leads to an inference that it had control over defendants.  *See* Docket No. 31 at 7.  Next, plaintiff argues that the relationship with any system integrator partner qualifies as an agency relationship because "the [system integrator] . . . is always loyal to the [p]laintiff."  *See* Docket No. 20 at 5, ¶ 24.  While that may be an industry norm, this allegation does not indicate that defendants agreed to act subject to plaintiff's control.  Plaintiff's argument that "[a]n [system integrator] is an agent . . . by legal standards" is conclusory and not supported by citations to any case law.  *See* Docket No. 31 at 7.  Finally, plaintiff appears to suggest that the regular use of the terms "partner" or "SI agent" in reference to Palmer's relationship with plaintiff carries some legal significance.  *See id.* at 7-8.  The Court is not persuaded that they do.  As defendants point out, under Colorado law, the "legal import" of agreements between for two parties is not established by the labels used by the parties.  *See* Docket No. 23 at 5 (quoting *Richardson v. Keely*, 142 P. 167, 169 (Colo. 1914)).  As previously discussed, the complaint fails to adequately allege the necessary control to make Palmer plaintiff's agent.  Similarly, there is no basis to conclude that Palmer and plaintiff were co-owners of a business, as is required to constitute a partnership under Colorado law.  *See* Colo. Rev. Stat. § 7-60-106(1).  Thus, the Court agrees with defendants that, because the complaint fails to allege that defendants acted as plaintiff's agent, defendants did not owe a fiduciary duty to plaintiff.  Accordingly, the Court will grant defendants' motion to dismiss as to the Third and Fourth Claims.

### C.   Fifth and Sixth Claims – Fraud

Plaintiff brings two claims against defendants for fraud; the Fifth Claim is

asserted against both defendants while the seemingly duplicative Sixth Claim is brought against Weber only.  Docket No. 20 at 20-24, ¶¶ 116-47.

The elements of a fraud claim in Colorado are: "(1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff." *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).  "Unless the speaker making the representations deliberately falsified his or her intention to induce reliance, statements of future events are not actionable." *Nelson v. Gas Research Inst.*, 121 P.3d 340, 343 (Colo. App. 2005).  Defendants contend that the complaint fails to establish either of the first two elements.  Docket No. 23 at 13-16.

The alleged false statements of material fact made by defendants are "statements and assurances that they would only promote [p]laintiff's products in connection with the Green project." *See* Docket No. 20 at 21, ¶ 126.  Although the complaint is less than clear, it appears statements to this effect were made (1) in a meeting on August 10, 2017, *see* Docket No. 20 at 5-6, ¶ 26, and (2) in an email sent by Weberg on August 11, 2017.[5]  *See id.* at 6, ¶ 29; Docket No. 20-1 at 2.  At the time

---

[5] Fed. R. Civ. P. 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake."  To plead a fraud claim with particularity, the complaint must "place the defendant on notice of the precise conduct with which it is charged" and "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Alpizar-Farras v. Favero*, 908 F.3d 910, 919 (3d Cir. 2018) (internal quotations and alterations omitted).  Although plaintiff's approach to drafting its fraud claims appears to

those statements were made, defendants had no knowledge of Green; according to the complaint, in both the August 10 and August 11 communications, plaintiff did not disclose the customer's name to defendants. *See* Docket No. 20 at 6, ¶ 27. Plaintiff alleges that defendants knew these statements were false "based on the now-apparent relationships [defendants have] with [p]laintiff's competitor." *See id.* at 21, ¶ 127. However, Trahan – the employee with relevant experience with plaintiff's competitor – did not begin work with defendants until three weeks after the August 10 and 11 representations. *See id.* at 10, ¶ 50 (alleging that Trahan was "knowledgeable with Unitronics' products"); Docket No. 20-1 at 2 (email from Weberg referring to "an engineer starting on August 28" familiar with plaintiff's products). Plaintiff points to no other facts in the complaint that support an inference that, when the statements were made on August 10 and 11, defendants had relationships with plaintiff's competitor. The complaint offers no additional factual allegations that would plausibly establish that defendants knew that the statements – which are statements of future events and not actionable without evidence of deliberate falsification, *see Nelson*, 121 P.3d at 343 – were false when they made them. The Court finds it implausible that defendants knew that they were going to promote products other than plaintiff's before Palmer and Weberg had any knowledge of Green or the project that they would be working on. Thus, the Court agrees that the complaint fails to establish that defendants knew that their representations on August 10 and 11 were false and will dismiss plaintiff's Fifth

---

have been, at best, scattershot, the Court is satisfied that the complaint satisfies Rule 9(b)'s particularity requirement.

and Sixth Claims.

### D.   Seventh and Ninth Claims – Unjust Enrichment and Promissory Estoppel

Plaintiff brings claims for unjust enrichment and promissory estoppel against Palmer.  Docket No. 20 at 24, ¶¶ 148-149 and at 26, ¶¶ 158-163.  Palmer argues that both claims are precluded by the economic loss rule.  Docket No. 23 at 17-19.

In order to maintain a distinction between tort and contract law, the Colorado Supreme Court has adopted the "economic loss rule."  *See Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000).  Under this rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."  *Id*. at 1264.  The focus of the inquiry is on "the source of the duty alleged to have been violated."  *Id*. at 1263.  The economic loss rule has "no application" where "the claim is based on a recognized independent duty of care."  *Id*.; *see also A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 866 (Colo. 2005).  Thus, in order to show that the economic loss rule bars plaintiff's claims, Palmer must show that (1) the claim lies in tort, (2) the source of plaintiff's loss is the breach of an express or implied contractual duty, and (3) the claim is not based on a recognized independent duty of care.

### 1.   Unjust Enrichment

In order to state a claim for unjust enrichment, plaintiff must show that "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would

make it unjust for defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008). In the complaint, plaintiff does not explain what facts it relies on to support an unjust enrichment theory; instead, it recites the elements of the cause of action. *See* Docket No. 20 at 24, ¶ 149.  However, in its response, plaintiff suggests that the unjust enrichment claim is pled should its breach of contract claim fail, and that the relevant circumstances that would make a benefit to Palmer unjust are that Palmer was introduced as plaintiff's agent to facilitate performance of a contract between plaintiff and Green, and that Palmer is now "reaping the benefits" through a long-term relationship with Green at plaintiff's expense.  Docket No. 31 at 19-20.  Plaintiff indicates that the unjust enrichment claim is brought in the event a factfinder determines that "no [enforceable] contract is deemed to have existed" between plaintiff and Palmer.  *Id.*

Read most generously, it appears that plaintiff is alleging that, if an express or implied contract did not exist between plaintiff and Palmer, the factfinder could find that a contract in law or quasi-contract existed that would enable recovery.  *See Interbank Investments, LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  A quasi-contract claim is "a purely equitable remedy" that does not "arise in any sense from promises made between the parties or any contract."  *See Jorgensen v. Colo. Rural Props., LLC*, 226 P.3d 1255, 1259 (Colo. App. 2010).  As a result, Colorado courts have declined to apply the economic loss rule to unjust enrichment claims that are supported by a quasi-contract.  *See id*. (explaining that "[a]pplication of the economic loss rule arising from a purely equitable obligation to pay would not serve to

maintain any distinction between tort and contract law"). Thus, at this juncture, it does not appear that the economic loss rule bars plaintiff's unjust enrichment claim.

### 2.  *Promissory Estoppel*

Colorado has adopted the promissory estoppel doctrine as articulated in the Restatement (Second) of Contracts. *Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995); *see also* Restatement (Second) of Contracts § 90. Promissory estoppel is premised on a fundamental principle of contract law "that one who makes promises must be required to keep them." *Bd. of Cty. Comm'rs of Summit Cty. v. DeLozier*, 917 P.2d 714, 716 (Colo. 1996). A prima facie case for relief under this doctrine requires:

> (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise.

> *Nelson*, 908 P.2d at 110.

A claim of promissory estoppel "lies in contract." *DeLozier*, 917 P.2d at 716 (Colo. 1996). Accordingly, the economic loss rule generally does not apply to promissory estoppel claims. However, defendant argues that plaintiff's claim is properly characterized as a claim of equitable estoppel. Docket No. 23 at 17-19. "To establish a claim of equitable estoppel, 'the party to be estopped must know the facts and either intend the conduct to be acted on or so act that the party asserting estoppel must be ignorant of the true facts, and the party asserting estoppel must rely on the other party's conduct with resultant injury.'" *Berg v. State Bd. of Agric.*, 919 P.2d 254, 259 (Colo. 1996) (quoting *Comm. for Better Health Care for All Colo. Citizens by*

21

*Schrier v. Meyer*, 830 P.2d 884, 891–92 (Colo. 1992)).  Such claims "lie[] in tort,"

*DeLozier*, 917 P.2d at 716, and thus may be subject to the economic loss rule.

The Court disagrees that plaintiff's claim is properly characterized as equitable estoppel.  The complaint alleges that "Palmer made a promise to [p]laintiff that it would exclusively promote and utilize [p]laintiff's products," that the alleged promise induced plaintiff to introduce Palmer to Green, and such reliance led to plaintiff being cut out of the Green project.  *See* Docket No. 20 at 26, ¶¶ 159-163.  The essence of plaintiff's claim is not that Palmer made a misstatement of fact; rather, it is that Palmer made a promise that it failed to keep.  *See DeLozier*, 917 P.2d at 716 ("While the doctrine of promissory estoppel is applicable to promises, the doctrine of equitable estoppel is applicable to misstatements of fact.").  Moreover, as the Court has already ruled, the facts alleged in plaintiff's complaint do not "support a claim for fraud or misrepresentation."  *See id*. at 717.  Thus, plaintiff's claim is properly characterized as one of promissory estoppel rather than equitable estoppel.  Accordingly, the economic loss rule does not apply, and plaintiff may proceed with its promissory estoppel claim.

### E.   Eighth Claim – Breach of Contract

Finally, plaintiff brings a claim against Palmer for breach of contract.  Docket No. 20 at 24-26, ¶¶ 150-57.  "Under Colorado law, a breach of contract claim has four elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff."  *Tegu v. Vestal Design Atelier LLC*, 407 F. Supp. 3d 1171, 1180 (D. Colo. 2019).

Palmer argues that the complaint fails to allege plausible damages.  Docket No. 23 at 19-23.  The Court disagrees.  The complaint sufficiently alleges that, as a result of a breach of contract by Palmer, plaintiff got "cut . . . out of the Green project" which led to a loss of business revenue.  *See* Docket No. 20 at 25, ¶¶ 156-157.  Palmer argues that the amount of loss, which plaintiff identifies as $10,000,000, is "conjectural."  *See* Docket No. 23 at 20.  However, Palmer confuses the requested remedy – a certain amount of money damages – with the requisite element of the claim – that plaintiff suffered some amount of damages.  *See DTC Energy Grp., Inc. v. Hirschfeld*, No. 17-CV-01718-PAB-KLM, 2020 WL 1333090, at *5 (D. Colo. Mar. 23, 2020) (noting that "the elements necessary to sustain a claim are not the same as the remedy for those claims").  Palmer also suggests that the complaint does not adequately allege that plaintiff "lost its business relationship with [Green]."  Docket No. 23 at 21-22.  This argument draws on a letter sent by Kumar to Weberg on January 12, 2018, indicating that Kumar has talked to Green and that Green "wish[es] to continue working with" plaintiff.  *See* Docket No. 20-6.  However, the complaint alleges that Green currently "market[s] and sell[s] the contemplated $CO_2$ machine using products obtained from [p]laintiff's competitor," *see* Docket No. 20 at 12, ¶ 63, and "stopped purchasing products from [p]laintiff" after Palmer "convinced" Green that it should use plaintiff's competitor's products.  *See id*. at 13, ¶¶ 74-75.  Taking all inferences in plaintiff's favor as the nonmoving party, the letter from Kumar tends to show only that, on January 12, 2018, Kumar believed that the relationship with Green could be salvaged.  *See* Docket No. 20-6.  The Court draws the reasonable inference from the

facts alleged in the complaint that plaintiff lost its business relationship with Green.

Because the complaint adequately alleges the necessary element of damages to

sustain a breach of contract claim, the Court will deny Palmer's request to dismiss the

claim.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion to Dismiss Amended Complaint [Docket No.

23] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that plaintiff's First, Third, Fourth, Fifth, and Sixth Claims are

**DISMISSED**.  It is further

**ORDERED** that plaintiff's Second Claim is **DISMISSED** against defendant Lynn

Weberg only.  It is further

**ORDERED** that defendant Lynn Weberg is dismissed from this action.


DATED April 24, 2020.

BY THE COURT:

_____

PHILIP A. BRIMMER
Chief United States District Judge