IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 19-cv-00718-PAB-NRN

AUTOTECH TECHNOLOGIES, LP d/b/a EZAutomation, an Illinois limited partnership,

     Plaintiff,

v.

PALMER DRIVES CONTROLS AND SYSTEMS, INC., a Colorado Corporation, and
LYNN WEBERG,

     Defendants.

_____

**ORDER**
_____

This matter is before the Court on Defendants' Motion *in Limine* to Disallow Plaintiff's Damages Expert and Barring Plaintiff from Presenting Evidence on Lost Profits [Docket No. 177] and Plaintiff's Motion to Bar Testimony of Matthew Wester [Docket No. 180]. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I.  BACKGROUND**

This case arises from conduct of defendants that allegedly deprived plaintiff of sales to a prospective customer, Green CO2 Systems ("Green"). Docket No. 121 at 1. Plaintiff EZAutomation ("EZAuto") is a manufacturer of industrial automation control products. Docket No. 178 at 1, ¶ 1. Vikram Kumar is the president of EZAuto and Shalabh Kumar is the founder and chairman. *Id.* at 2, ¶ 7; Docket No. 190-14 at 1, ¶ 1. Green is a manufacturer of carbon dioxide detection equipment and is operated by Dan Schneider and David Schneider. Docket No. 178 at 1, ¶ 2. EZAuto alleges that Green was interested in purchasing components for carbon dioxide detection equipment from

EZAuto.  Docket No. 121 at 12, ¶ 62.  EZAuto claims that it brought defendant Palmer Drives Controls and Systems, Inc. ("Palmer") into the project as a systems integrator to program the components.  *Id*. at 5-7, ¶¶ 24-26, 31.  EZAuto alleges that defendants made false representations to Green, which caused Green to decide to use a competitor's products instead of plaintiff's products.  *Id*. at 17, ¶ 97.  Plaintiff's second amended complaint asserts claims for tortious interference with prospective economic advantage; breach of fiduciary duties; fraud; unjust enrichment; breach of contract; and promissory estoppel.  *Id*. at 11-25.

EZAuto retained Kenneth Mathieu, an expert in accounting and valuation, as a damages expert to calculate plaintiff's lost profits.  *See* Docket No. 189 at 1; Docket No. 177-3 at 3.  Defendants filed a motion to exclude Mr. Mathieu.  Docket No. 177. Defendants retained Matthew Wester as an expert to rebut Mr. Mathieu's testimony. *See* Docket No. 180-1 at 3.  EZAuto moved to exclude Mr. Wester's testimony.  Docket No. 180.

On November 14, 2022, EZAuto filed an opposed motion to amend Mr. Mathieu's expert report.  Docket No. 202.  Mr. Mathieu's original report analyzed plaintiff's lost profits in reference to two different products: 1) the "HPP" product, which is comprised of components that EZAuto historically designs and manufacturers in mass quantities and 2) the "HPP+CP" product, which is comprised of components that EZAuto has not historically manufactured, but "maintains the ability to do so."  Docket No. 91-7 at 10-11. EZAuto sought to file an amended report by Mr. Mathieu to remove the damages calculation for the HPP+CP product because plaintiff decided to focus only on the lost profits from the HPP product at trial.  Docket No. 202 at 2.  The magistrate judge

granted EZAuto's motion, finding that the amended report only deletes references to the larger and more speculative category of HPP+CP damages and does not change the calculations for the HPP category.  Docket No. 209 at 2-4.  The magistrate judge granted defendants leave to file a supplemental brief.  *Id*. at 5.  EZAuto filed Mr. Mathieu's amended report, containing only the HPP calculation of damages, which reduces plaintiff's claimed damages from $31.9 million to $14.8 million.  *See* Docket No. 210; Docket No. 209.[1]

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[] a two-step analysis."  *103 Investors I, L.P. v. Square D Co*., 470 F.3d 985, 990 (10th Cir. 2006).  After determining whether the expert is qualified, the proffered opinions must be assessed for reliability.  *See id*.; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods,"

---

[1] The amended report does not contain Mr. Mathieu's exhibits.  *See generally* Docket No. 210.  As a result, for clarity, the Court will cite to Docket No. 203-1 for the exhibits, which is the proposed amended report containing exhibits attached to plaintiff's motion to amend.  *See* Docket No. 203-1.  The Court will cite to Docket No. 210 for Mr. Mathieu's report.

and reflect a reliable application of "the principles and methods to the facts of the case").

In ruling on a Rule 702 motion, the district court has a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes."  *Daubert*, 509 U.S. at 597.  It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.  *Basanti v. Metcalf*, 35 F. Supp. 3d 1337, 1342 (D. Colo. 2014).

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).  Ultimately, the test requires that the expert "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Goebel v.*

*Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe,* 556 F. Supp. 2d at 1221. "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire,* 526 U.S. at 152.

Assuming the standard for reliability is met, a court must also ensure that the proffered testimony will assist the trier of fact. *See id.* at 156; *United States v. Rodriguez-Felix,* 450 F.3d 1117, 1122-23 (10th Cir. 2006). "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia,* 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted).

Rule 26 of the Federal Rules of Civil Procedure permits the "admission of rebuttal expert testimony that is 'intended solely to contradict or rebut evidence on the same subject matter identified' by an initial expert witness." *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC,* No. 14-cv-00134-PAB-KMT, 2016 WL 1597529, at *2 (D. Colo. Apr. 21, 2016) (quoting *TC Sys. Inc., v. Town of Colonie, NY,* 213 F. Supp. 2d 171, 179 (N.D.N.Y. 2002)). By contrast, "an affirmative expert serves to establish a party's case-in-chief." *Id.* at *3. A rebuttal expert must submit a report that includes "a showing of facts supporting the opposite conclusion of those at which the opposing party's experts arrived in their response reports." *Id.* (citation omitted). "[R]ebuttal

experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts." *Id.* (citation omitted).

Finally, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

## III.   ANALYSIS

### A. <u>Kenneth Mathieu</u>

Defendants seek to exclude EZAuto's damages expert, Kenneth Mathieu, from testifying pursuant to Rule 702 and argue that Mr. Mathieu's lost profits calculation is unreliable.  Docket No. 177 at 1-3.  Mr. Mathieu calculated EZAuto's lost profits using a methodology approved by the American Institute of Certified Public Accountants ("AICPA"), which calculates the "net incremental revenues lost, offset by net incremental costs avoided."  Docket No. 210 at 7.  Mr. Mathieu offers an opinion that EZAuto would have "earned net incremental profits up to $14.8 million if Green became a customer of EZAuto beginning" in January 2018, with the profits varying based upon the number of products sold and the length of the customer relationship.  *Id.* at 4.

Defendants do not challenge Mr. Mathieu's qualifications to render an expert opinion on plaintiff's lost profits.  *See generally* Docket No. 177.  Defendants also do not challenge the AICPA methodology.  *See generally id*.  Rather, defendants argue that Mr. Mathieu did not exercise proper expertise in determining what data to use in applying the AICPA methodology, thus rendering his lost profits opinion unreliable.  *Id.* at 3, 6-7.  Specifically, defendants argue that the lost profits opinion is unreliable

because Mr. Mathieu: 1) uses an aspirational sales price and sales volume in his calculation; 2) uses a growth rate and damages period not supported by the evidence; 3) fails to properly classify certain incremental costs; and 4) ignores plaintiff's ability to finance the project.  *Id.* at 3-20.  The Court will consider each argument concerning the reliability of the opinion. [2]

### 1.  Sales Price and Sales Volume

Defendants argue that Mr. Mathieu's lost profit calculation is unreliable due to his assumptions regarding the sales price and sales volume for the HPP product, which were derived from preliminary "whiteboard" negotiations between EZAuto and Green. *Id*. at 7.  Mr. Mathieu's report states that, on December 8, 2017, EZAuto and Green had a meeting at which the price and sales volume for the HPP product were discussed. Docket No. 210 at 11.  The parties wrote these numbers on a whiteboard.  *Id*.; *see also* Docket No. 190-1.  David Schneider testified at his deposition that the following individuals from EZAuto and Green were present at the December 8, 2017 meeting: Vikram Kumar, Dan Schneider, and David Schneider.  Docket No. 177-9 at 111:13-14. A photograph of the whiteboard reflects a price for the HPP components ($720 + $65) and an anticipated starting sales volume of 1,000 units.  Docket No. 190-1; *see also* Docket No. 210 at 11.  Mr. Mathieu used a sales price of $785 for the HPP product and a sales volume of 1,200 and 2,000 units per year.  Docket No. 210 at 11.  In determining the sales volume for his calculation, Mr. Mathieu also considered evidence of market potential in Green's project scope document and Dan Schneider's deposition

---

[2] The Court's references to Mr. Mathieu's "opinion" refers to Mr. Mathieu's ultimate calculation of lost profits, namely, that EZAuto would have "earned net incremental profits up to $14.8 million."  *See* Docket No. 210 at 4.

testimony that annual sales could be as high as 5,000 units. *Id.*; *see also* Docket No. 190-10 at 12, 47:3-13.

Defendants argue that Mr. Mathieu's sales price and volume assumptions were "largely drawn out of thin air" because Mr. Mathieu took these numbers from preliminary whiteboard negotiations between EZAuto and Green, that were never reduced to a written agreement or commitment to purchase the HPP product at that price or volume. Docket No. 177 at 7. David Schneider testified that the whiteboard negotiation was just a "spit balling of the different products" and that the numbers were "exaggerated." Docket No. 177-9 at 114:10-17; 178:1-2. Defendants argue that Mr. Mathieu adopted his client's wishful sales price and volume projections, which were not the result of an agreed upon contract. Docket No. 177 at 7-9. They also claim that Mr. Mathieu failed to test the reasonableness of the hypothetical price and volume with a "before and after" analysis.[3] *Id.* at 10. Defendants state that courts have excluded experts where the experts relied on optimistic sales projections from the clients and failed to investigate market conditions or test the reasonableness of the projections. *Id.* at 8-9 (citing *US Salt, Inc. v. Broken Arrow, Inc.*, 2008 WL 2277602 (D. Minn. May 30, 2008); *Ariens Co. v. Woods Equip. Co.*, 2006 WL 2597979 (E.D. Wis. Sept. 9, 2006); *Victory Records, Inc. v. Virgin Records Am., Inc.*, 2011 WL 382743 (N.D. Ill. Feb. 3, 2011)).

EZAuto responds that Mr. Mathieu relied upon sufficient facts and data to determine the price and anticipated sales volume. Docket No. 189 at 5-6. EZAuto

---

[3] A before and after analysis determines whether projected sales are consistent with a company's historical performance. *Id.* at 10; *see also* Docket No. 180-1 at 17 (explaining that the "before-and-after method compares a plaintiff's performance before an event causing lost profits to a plaintiff's performance after an event.").

states that Green "agreed to pay $785" per HPP product as evidenced by the whiteboard negotiation between EZAuto and Green as well as the deposition testimony of Dan Schneider.[4]  *Id*. at 6; *see also* Docket No. 210 at 12; Docket No. 190-1; Docket No. 190-10 at 15, 57:5-8.  Plaintiff states that the projected sales volume of 1,200 to 2,000 units per year is supported by the evidence because Green estimated annual sales as high as 5,000 units per year.  Docket No. 189 at 5; *see also* Docket No. 190-10 at 12, 47:5-9.

The Court finds that Mr. Mathieu relied on sufficient facts and data to determine the sales price and sales volume of the HPP product.  Defendants are correct that the whiteboard discussion on December 8, 2017 was preliminary and did not represent a contract to purchase the HPP product at the written price or volume.  *See* Docket No. 177 at 7.  However, Mr. Mathieu's price and volume assumptions reflect projections that were a product of negotiations, albeit preliminary ones, between EZAuto and the prospective customer, Green, and therefore the numbers are relevant.  *See* Docket No. 210 at 11; Docket No. 190-1.[5]  Mr. Mathieu additionally reduced the estimated volume in an exercise of discretion, even though the testimony of Dan Schneider supported a potential annual sales volume of 5,000 units per year.  *See* Docket No. 210 at 11;

---

[4] Vikram Kumar testified that Dan Schneider agreed to the whiteboard price and quantity and these discussions represented an "agreement and contract to move forward" between EZAuto and Green.  Docket No. 190-12 at 6, 8, 21:4-8, 30:14-31:5.
[5] This case is distinguishable from *US Salt* and *Victory Records* because the experts in those cases relied almost exclusively on optimistic sales estimates provided by their clients, not sales estimates that were a product of negotiations between the client and the customer.  *See US Salt*, 2008 WL 2277602, at *1; *Victory Records*, 2011 WL 382743, at *2.

Docket No. 190-10 at 12, 47:5-9.[6]  Defendants fail to suggest a more reliable price or volume estimate discussed between EZAuto and Green.  *See generally* Docket No. 177.  While the price and volume estimates will be contested at trial, defendants have failed to demonstrate that Mr. Mathieu violated Rule 702 in utilizing these inputs for the AICPA methodology. [7]  Accordingly, the Court rejects defendants' argument that Mr. Mathieu's opinion is unreliable based on the sales price of $785 and the sales volume of 1,200 to 2,000 units per year.

### 2.  Growth Rate and Damages Period

Defendants argue that Mr. Mathieu's lost profit calculation is unreliable because he uses a growth rate and damages period not supported by the evidence.  Docket No. 177 at 11.  Mr. Mathieu's damage estimates assume EZAuto would sell the HPP product to Green for ten years.  Docket No. 210 at 9.  Mr. Mathieu's calculation uses a 5 percent growth rate for the model of 1,200 units sold per year and a 10 percent growth rate for the model of 2,000 units sold per year.  *Id*. at 11.  Mr. Mathieu's growth rate projections are based on the growth rates for the cannabis industry and chain restaurant industry, *id*. at 11 n.52-53, which Mr. Mathieu assumed would be two of the largest industries that would purchase Green's final product.  *See* Docket No. 189 at 14; Docket No. 177 at 11.  Defendants argue that Mr. Mathieu "cites no facts of record that would suggest that a reasonable expert would apply an *industry* growth metric to projected sales of a *new* product to a *single* interested customer such as Green CO2.  To do so

---

[6] The Court further notes that defendants' rebuttal expert Mr. Wester acknowledges there is an evidentiary basis for the sales volume in his deposition.  Docket No. 190-11 at 38, 142:5-143:3.

[7] The conflict between David Schneider's testimony and Vikram Kumar's testimony over what transpired at the "whiteboard meeting" is appropriately resolved by the jury.

ignores that Green CO2 would be highly vulnerable to competition that could wipe out the entirety of Green CO2's aspirational customer base in a heartbeat." Docket No. 177 at 12. Furthermore, defendants argue that the undisputed testimony of David Schneider demonstrates that Green would not have entered into a long-term deal to buy the products given the rapid technological changes in the industry. *Id.* (citing Docket No. 177-9 at 181:15-183:2).

EZAuto argues that the growth rate and damages period is supported by sufficient facts and data. Docket No. 189 at 5-6, 14. Mr. Mathieu provided damages calculations for up to ten years based on evidence that EZAuto and Green discussed a ten-year relationship. Docket No. 210 at 9; *see also* Docket No. 190-12 at 10, 40:3-16. Mr. Mathieu tested the reasonableness of the ten-year assumption by looking at the average length of the relationship between EZAuto and its top customers, which was over twelve years. Docket No. 210 at 9. Furthermore, EZAuto argues that growth rates can only be based upon the markets that drive demand, and Mr. Mathieu's growth rates were derived from the two largest industries that would use Green's product. Docket No. 189 at 14.

The Court finds that Mr. Mathieu relied on sufficient facts and data to determine the growth rate and damages period for his model. Mr. Mathieu tested the reasonableness of the ten-year assumption by comparing it to the length of EZAuto's historical relationships with top customers. *See* Docket No. 210 at 9. Defendants are correct that an expert must consider potential competition in calculating lost profits. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 728 (10th Cir. 1993). However, Mr. Mathieu has a factual basis for his assumption that there was a potentially large market

for Green's final product, and thereby EZAuto's HPP product.  *See* Docket No. 210 at 10 n.46 (citing Green's marketing video describing the controller and the market potential); Docket No. 190-3 at 252-53 (email from Dan Schneider stating that Green is "negotiating with an extremely large gas company where these builds will be off the chart."); Docket No. 190-3 at 15 (Green's product description discussing how its controller "will be all inclusive for the various markets of [c]arbon [d]ioxide usage.  The beverage and cultivation industries are the two primary focal points for this application. Other applications for this unit will be swimming pools, dry cleaning, and industrial carbon dioxide usage locations.").  While David Schneider testified at his deposition about competing products currently on the market, *see* Docket No. 177-9 at 180:5-14, the discussions between Green and EZAuto at the December 8, 2017 meeting reflect optimism about the market potential.  *See* Docket No. 190-10 at 12-13, 46:4-47:13 (Dan Schneider's deposition testimony discussing the December 8 meeting and his belief that it was a "big project" and "could be a highly utilized product").  Furthermore, defendants do not challenge the cannabis and restaurant industries as likely target markets for Green's final product.  *See generally* Docket No. 177.  Defendants fail to explain why Mr. Mathieu's reliance on the growth rates of these two target industries is unreliable when these industries would drive demand for Green's final controller and thereby plaintiff's HPP product.  *See generally id*.  Accordingly, the Court finds a factual basis for Mr. Mathieu's assumptions that form permissible inputs for his methodology.  *See Goebel*, 346 F.3d at 991 (discussing how the test under Rule 702 is reliability, not correctness).

### 3. Incremental Costs

Defendants argue that Mr. Mathieu's methodology is unreliable because he ignored certain incremental costs, such as variable operating expenses, in his ten-year projection.  Docket No. 177 at 16-17.  Defendants state that Mr. Mathieu assumed there would be no increase in overhead or operating expenses, notwithstanding a dramatic increase in sales revenue.  *Id*. at 17.  Citing *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig*., 831 F. Supp. 1354, 1386 (N.D. Ill. 1993), defendants argue that the cost of sales, overhead, and administrative expenses are variable in the long run. *Id*.  EZAuto argues that Mr. Mathieu relied upon sufficient facts to calculate the incremental costs, including EZAuto's audited financial statements and discussions with EZAuto's management.  Docket No. 189 at 6-7.  EZAuto asserts that Mr. Mathieu properly concluded that plaintiff would not incur other significant incremental costs aside from labor and materials through Mr. Mathieu's discussions about EZAuto's business structure and finances with Shalabh Kumar and Vikram Kumar.  *Id*. at 15.  Defendants argue in response that an expert cannot rely solely on the assumptions of his client. Docket No. 213 at 4.

Mr. Mathieu's report states that EZAuto's incremental costs to produce the HPP products "are primarily labor and materials," and he calculates the incremental costs at $240.46.  Docket No. 210 at 12.  Mr. Mathieu calculated the incremental costs by utilizing the revenue and costs from EZAuto's 2017-2019 audited financial statements. *Id*.; Docket No. 203-1 at 37-38.  Mr. Mathieu's report concluded that "[a]dditional overhead expenditures would not be required to produce the units."  Docket No. 210 at 8.  The report explains that plaintiff's average manufacturing production was between

20 to 25 percent and that sales to Green would only require an additional 9 to 10 percent production capacity. *Id.* at 13. Mr. Mathieu's declaration additionally claims that the information in Shalabh Kumar's declaration is consistent with their discussions of the business prior to the completion of Mr. Mathieu's report. Docket No. 190-17 at 6, ¶ 21. Shalabh Kumar's declaration states that he explained the business operations in detail to Mr. Mathieu, including that the only incremental costs in manufacturing the HPP product is labor and materials; the biggest cost is production line set-up time; the largest component of the plant's overhead (75 percent) is fixed rent payable to Shalabh Kumar; the company would not need to acquire any additional equipment because the plants were operating at 20 percent capacity; the second and third highest components of overhead, utilities and insurance, were fixed; and there would be no increase in research and development costs because the HPP product was already designed. Docket No. 190-14 at 3-5, ¶ 19.

The Court finds that Mr. Mathieu's incremental cost calculation is sufficiently reliable under Rule 702. Mr. Mathieu relied on EZAuto's audited financial statements to calculate the cost of labor and materials, *see* Docket No. 203-1 at 37-38, and this initial incremental cost calculation ($240.46) was substantiated in Mr. Mathieu's supplemental report, where he discussed a July 2021 study conducted by plaintiff that calculated the actual incremental costs to produce the HPP product at $236.84. *See* Docket No. 177-2 at 3. While defendants argue that Mr. Mathieu improperly assumed there would be no increase in overhead or operating expenses in the long run, defendants do not challenge the accuracy of the information in Shalabh Kumar's declaration regarding EZAuto's overhead and operating expenses. *See generally* Docket Nos. 193, 213.

14

Defendants do not contest Mr. Kumar's assessment that EZAuto would experience no increase in plant overhead, capital expenditures, or research and development costs for the HPP product.  *See generally* Docket Nos. 193, 213.  Any potential increase in overhead and operating expenses appears to be a minor component of the incremental costs, which would not significantly alter Mr. Mathieu's calculation.[8]  Accordingly, the Court finds that Mr. Mathieu's incremental cost calculation is sufficiently reliable and finds no error in his classification of certain expenditures as fixed instead of variable in the long run.

### 4.  Financing for the Project

Defendants argue that Mr. Mathieu's opinion is unreliable because he ignored EZAuto's ability to finance the project.  Docket No. 177 at 13.  Defendants claim that plaintiff's audited financial statements reveal an inability to fund the project: EZAuto had utilized 97 percent of its line of credit of $5,954,000 and had only $200,000 remaining on the line of credit.  *Id.* at 13-14.  Defendants also argue that EZAuto could not have funded the increased production through existing cash flows.  *Id.* at 14.  Defendants state that EZAuto attempted to conceal this information in its financial statements, yet Mr. Mathieu did not amend his report after receiving the unredacted financial statements.  *Id.* at 4-6; *see also* Docket No. 213 at 5-6.  Citing *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124 (M.D. Pa. 2015), defendants argue that courts have excluded financial experts under similar circumstances when the plaintiff withheld important financial

---

[8] Mr. Mathieu is also not required to adopt the specific methodology in *Mahurkar*.  *See generally Mahurkar*, 831 F. Supp. at 1386.

information from the expert, but the expert failed to amend his report after discovering the financial information.  Docket No. 177 at 5.

Mr. Mathieu denies that EZAuto strategically withheld information regarding its ability to finance the project and asserts that he received notes to the audited financial statements, which discussed plaintiff's line of credit and available capital, before issuing his report.  Docket No. 190-17 at 1-3.  Mr. Mathieu asserts that he considered EZAuto's ability to finance the project when completing his analysis.  *Id.* at 2.  He states that the cash flow generated from initial sales to Green would be "more than adequate to fund production after the first few months" as evidenced in exhibits 1-4 of his report.  *Id.* Furthermore, he also considered additional sources of equity capital disclosed in the audited financial statements, including Shalabh Kumar's assets and the cash surrender value of the life insurance policy.  *Id.* at 3.[9]

The Court finds that Mr. Mathieu's assumptions regarding EZAuto's ability to finance the project satisfy Rule 702's reliability requirement.  Although EZAuto's financial statements reveal that it had utilized 97 percent of its line of credit, Mr. Mathieu concluded that EZAuto could finance production through the initial sales to Green in the first few months.  *See* Docket No. 190-17 at 2.  As demonstrated in Exhibit 1 of his report, if EZAuto sold 1,200 units of the HPP product to Green in 2018, EZAuto's revenue would be $942,000, costs would be $288,552, and net profits would total $653,448.  Docket No. 203-1 at 35.  Shalabh Kumar states in his declaration that EZAuto's payment terms with Green would have been 30 days, whereas EZAuto had

---

[9] Shalahb Kumar states that EZAuto had a $10 million dollar line of credit between 2017 to 2018 with his assets and life insurance policy as the collateral.  Docket No. 190-14 at 2, 5, ¶¶ 12, 19p.

90-day payment terms with most of its vendors.  Docket No. 190-14 at 5, ¶ 19p.  Mr.

Mathieu's conclusion that the cash flow could finance the production in the first few

months is therefore an acceptable assumption under his model.  *See Goebel*, 346 F.3d

at 991.  The Court further finds that the *Bruno* case is distinguishable and will therefore

not exclude Mr. Mathieu's opinion on that ground.[10]

Accordingly, the Court denies defendants' motion to exclude Mr. Mathieu's

opinion on lost profits.

### B.  <u>Matthew Wester</u>

EZAuto seeks to exclude the testimony of Matthew Wester, the defendants'

rebuttal expert on the issue of lost profits, on the grounds that he has impermissibly

become an advocate for the defendants and that his opinions are not expert opinions.

Docket. No. 180 at 2-4.  EZAuto alternatively moves to exclude all ten of Mr. Wester's

opinions.  *Id*. at 7. [11]

---

[10] In *Bruno*, the plaintiff intentionally destroyed all of her business's financial records, which "forced Plaintiffs' own experts to rely on secondhand sales projections."  *Bruno*, 311 F.R.D. at 125.  Plaintiff's electronic financial files were later restored, however, revealing that actual sales fell far below the experts' sales projections.  *Id*. at 131-32. The court excluded the expert testimony because the experts refused to consider the real financial data and relied instead upon the inflated sales projections.  *Id*. at 140-41. In contrast, EZAuto did not engage in spoliation, but rather allegedly redacted certain information from the financial records.  *See* Docket No. 177 at 4-6.  However, Mr. Mathieu asserts that the line of credit information was never strategically withheld from him because the audited financial statements, which Mr. Mathieu reviewed before issuing his report, discussed EZAuto's 97 percent utilization of its line of credit and available capital of $200,000.  Docket No. 190-17 at 2.  In contrast to *Bruno*, Mr. Mathieu analyzed the underlying financial information from the audited financial statements to develop his projections.  *See id*.

[11] Defendants' response contains many repeated arguments regarding the admissibility of Mr. Mathieu's testimony.  *See generally* Docket No. 187.  The Court will not re-address these arguments.

### 1. *Miscellaneous Challenges*

EZAuto argues that Mr. Wester has violated his duty of impartiality and has become an advocate for the defendants.  Docket No. 180 at 4.  EZAuto cites several statements from Mr. Wester's report[12] and argues that defendants are improperly using Mr. Wester's testimony to resolve disputed factual issues.  *Id*. at 4-5.  EZAuto additionally argues that Mr. Wester has become an advocate for the defendants, as demonstrated by his "false" deposition testimony and misleading statements regarding his resume qualifications.  *Id*. at 6-7; Docket No. 192 at 2-3.  EZAuto argues that Mr. Wester stated at his deposition that he has never been barred from testifying to any damage opinions, yet he was barred by Judge Raymond Moore of this district from testifying to over $11 million dollars in damages in *Lambland, Inc. v. Heartland Biogas*, *LLC*, No. 18-cv-01060-RM-KLM, 2021 WL 2981935 (D. Colo. July 15, 2021).  Docket No. 180 at 6-7.  EZAuto further states that Mr. Wester's resume contains several false statements, including that he was retained as the expert witness in two cases involving lost profits.  *Id*. at 6.

Defendants argue that Mr. Wester is not an advocate, but is rather testifying to the unique difficulties that economic experts, like Mr. Mathieu, encounter when

---

[12] Plaintiff cites the following statements from Mr. Wester's report: 1) "[Plaintiff] did not lose a profitable opportunity since the Project never went to market. To award lost profits to [Plaintiff] would be to give profits to [Plaintiff] on a project in which no other participants earned profits;" 2) "the Mathieu Report is calculating revenue on a product which as discussed earlier, was not a finished device and did not meet all of Green's needs. . . .  As a result, it appears the Mathieu Report is not calculating damages based on the right product – i.e., the product needed for the Project;" and 3) plaintiff's ability to mitigate its damages was impacted by "(a) [Plaintiff's] failure to demonstrate to Green that [Plaintiff] had products that met Green's needs; and (b) [Plaintiff's] decision to pursue litigation in this matter."  *Id*. at 4.

estimating lost profits based on a new product.  Docket No. 187 at 16-17.  Defendants further state that Mr. Wester's deposition testimony and his resume are accurate.  *Id.* at 19.  Defendants maintain that, in the *Heartland* case, Mr. Wester never "reached an opinion" on lost profits because his report calculated other types of damages, and the report merely cited that he reviewed the lost profit calculations prepared by the parties. *Id.*; *see also Heartland*, 2021 WL 2981935, at *4.  They argue that Mr. Wester's deposition testimony was not false, even though Judge Moore barred him from testifying to lost profits, because Mr. Wester never offered an opinion on lost profits.  Docket No. 187 at 19-20.  Furthermore, defendants state that Mr. Wester's resume is accurate because he consulted as a manager on those lost profit cases and never claimed he testified as the expert witness.  *Id.* at 20 (citing Docket No. 180-1 at 36.)

The Court rejects plaintiff's arguments that Mr. Wester should be excluded based on advocacy for the defense.  The Court does not find any materially false or misleading statements in Mr. Wester's deposition testimony or resume.  The isolated statements that EZAuto cites do not demonstrate that Mr. Wester has become an advocate for the defense.  Accordingly, the Court rejects these arguments.

EZAuto additionally appears to argue that Mr. Wester should be excluded because his testimony is not an expert opinion.  Plaintiff states that "Mr. Wester's opinions are not based upon any specialized knowledge, skill or experience, training or education."  Docket No. 180 at 2.  EZAuto further states that Mr. Wester did not provide his own opinion of plaintiff's damages or critique the accuracy of Mr. Mathieu's calculations.  *Id.* at 3.  This section of the motion fails to comply with the Court's Practice Standards, which state that a Rule 702 motion "shall identify with specificity

each **opinion** the moving party seeks to exclude. . . [and] identify the specific ground(s)

on which each opinion is challenged." Practice Standards (Civil Cases), Chief

Judge Philip A. Brimmer, § III.G.  Furthermore, a rebuttal expert is not required to

independently calculate a plaintiff's lost profits; a rebuttal expert "must restrict their

testimony to attacking the theories offered by the adversary's experts." *Spring Creek*

*Exploration*, 2016 WL 1597529, at *3.  Mr. Wester's report specifically attacks the

assumptions and methods of Mr. Mathieu's damages calculations. *See generally*

Docket No. 180-1.  As a result, the Court denies this portion of the motion.

### 2.  *Challenges to Specific Opinions*

The Court will evaluate the specific objections that EZAuto asserts for Mr.

Wester's ten opinions.

### a.  Opinion 1

EZAuto argues that the following opinion is "not a proper subject of expert

testimony" and should be excluded:

- Opinion 1: Damages in the Mathieu Report are based on several disputed items, including, but not limited to, causation, whether the Green Touch Controller would actually go to market, and whether Green would have become a customer of EZAuto.

Docket No. 180 at 7; Docket No. 180-1 at 4.  Defendants argue that an expert's

assumptions are a proper basis for rebuttal testimony.  Docket No. 187 at 8.  While true

as a general matter, a rebuttal expert's report is limited to those matters on which the

opposing expert stated opinions. *See Spring Creek Exploration*, 2016 WL 1597529, at

*3.  Mr. Mathieu's report only provides an opinion on damages. *See* Docket No. 210 at

3 ("Specifically, I was asked to address the following question: Assuming Palmer is

found liable for wrongful conduct and Green would have become a customer of EZAuto,

what is the amount of damages sustained by EZAuto?").  Opinion 1 is outside the scope

of proper rebuttal testimony because Mr. Mathieu does not express an opinion on

liability or whether Green would become a customer of plaintiff.  *See generally id*.

Instead, Mr. Mathieu assumes these matters as his starting point.  *See id.* at 3.  As a

result, the Court will exclude opinion 1.

### b.  Opinions 2-5

EZAuto moves to exclude the following opinions as irrelevant or without a

supporting factual basis.

- Opinion 2: The Mathieu Report does not disclose any analysis or methods used to test the reasonableness of the lost revenue projections.  When applying methods commonly used by damages experts to test the reasonableness of the result, the analysis reveals that the amount and range of damages calculated in the Mathieu Report are significant when compared to actual past results of EZAuto, both to EZAuto's sales overall and to sales made to top customers.  In addition, the Mathieu Report provides a large range of damages and little to no guidance as to which damage measures are appropriate.
- Opinion 3: The Mathieu Report references one practice aid related to the calculation of lost profits.  However, the Mathieu Report fails to follow some of the guidance in the cited practice aid and does not follow guidance in other authoritative literature relevant to lost profits calculations.
- Opinion 4: The Mathieu Report does not disclose any financial summaries or discussion of EZAuto's business history or financial performance prior to the alleged damages.  In addition, the linear sales projected in the Mathieu Report do not appear to take into consideration COVID or other business trends impacting EZAuto given that EZAuto's actual sales were flat in 2015 to 2018 and decreased in 2019 and 2020.
- Opinion 5: The Mathieu Report does not disclose the specific method used to develop the lost revenue projections.  The Mathieu Report at least in part relied on a post-litigation projection prepared by EZAuto and the Mathieu Report does not disclose whether or not the projection was tested against historical results, or the extent to which EZAuto management's ability to accurately forecast future results was considered.  The Mathieu Report also does not disclose whether or not and how the yardstick method was considered for use despite reliance on the premise that the majority of EZAuto's revenue is generated by products that are similar to the HPP products.  In terms of revenue calculations, the Mathieu Report is calculating revenue on a product which was not a finished device and did not meet all of Green's needs. In addition, the number of units used in the Mathieu Report are disputable based on deposition testimony of Green's

representatives and the size of Green's actual customer base as of December 2017.

Docket No. 180 at 7-9; Docket No. 180-1 at 4-5.  EZAuto argues that opinions 2, 4, and 5 should be barred because EZAuto's past history with different customers and products is not relevant to its damages in this discrete new business opportunity. Docket No. 180 at 7, 9.  EZAuto also argues that opinion 4 should be excluded because Mr. Wester assumes without any factual basis that COVID would have impacted sales to Green.  *Id.* at 9.  EZAuto asserts that opinion 3 should be excluded as irrelevant because Mr. Wester never concluded that Mr. Mathieu failed to meet the AICPA standards and it is unclear what other literature Mr. Wester is referencing in opinion 3. *Id.* at 8.

Mr. Wester identifies numerous treatises and authorities in his report, which discuss the importance of testing the reasonableness of projected lost profits by comparing the calculation to the company's historical past performance or other industry data.  Docket No. 180-1 at 11-15, 17-18.  Opinions 2, 4, and 5 are thus relevant to Mr. Wester's criticisms of Mr. Mathieu's methodology and lost profits calculation.  In opinion 4, Mr. Wester does not assume that COVID would have impacted the sales of the HPP product, but merely argues that a reasonable expert would have taken COVID into account given that plaintiff's audited financial statements showed that actual sales decreased during the pandemic.  *Id.* at 17.  Opinion 3 is relevant because Mr. Wester directly challenges Mr. Mathieu's methodology for failing to follow some of the guidance in an AICPA practice aid and other cited literature.  *See id.* at 16.  Accordingly, this portion of the motion is denied.  Mr. Wester is permitted to testify as to opinions 2, 3, 4, and 5.

### c. Opinions 6-9

EZAuto seeks to exclude the following opinions related to information that Mr.

Mathieu allegedly failed to consider in his report:

- Opinion 6: The Mathieu Report did not consider information commonly considered by damages experts in assessing lost profits, such as, for example, more than one year of unimpaired (pre-loss) financial statements, complete audited financial statements with all accompanying notes, a detailed general ledger, customer records or reports with units sold, sales prices and discounts, and inventory reports.
- Opinion 7: In terms of reliance on EZAuto's management, Mathieu was asking for relevant records to substantiate the inputs in the damages model and verbal and/or email representations made by EZAuto. However, EZAuto provided a limited number of business records to Mathieu and, as a result, the level of testing and analysis to verify the accuracy of representations made by EZAuto management was limited.
- Opinion 8: The Mathieu Report failed to consider common financial data to assess incremental costs and, as a result, no financial analysis was performed regarding any cost of goods sold overhead, selling expenses, engineering expenses, or general and administrative expenses that may be incremental with the alleged lost sales.
- Opinion 9: In terms of capacity, the Mathieu Report addresses manufacturing capacity, in part by relying on management's oral representations, but does not address financial capacity including whether and how EZAuto could have obtained the financing needed to produce the at issue units, and the related financial costs to do so.

Docket No. 180 at 9-10; Docket No. 180-1 at 5.  EZAuto's basis for excluding opinions 6

and 8 is unclear.  *See generally* Docket No. 180.  Plaintiff argues that Mr. Mathieu

expressly stated the general ledgers would not provide relevant information to his

damages calculations because the general ledgers do not have product-specific cost

information.  *Id*. at 3.  EZAuto objects to opinion 7 on the ground that it is a statement of

fact, not an expert opinion.  *Id*. at 10.  EZAuto objects to opinion 9 on the ground that

Mr. Wester does not provide any factual basis for the assumption that plaintiff would

need financing for the project.  *Id*.

The Court will deny this portion of the motion.  The information that Mr. Mathieu allegedly failed to consider in his report is proper grounds for rebuttal expert testimony.  Mr. Wester references applicable standards in practice aids and explains how Mr. Mathieu failed to consider the relevant industry standards for calculating lost profits.  *See* Docket No. 180-1 at 18-28.  Mr. Wester provides an analysis of plaintiff's line of credit and borrowing base utilization, which is a sufficient factual basis for his critique that EZAuto would need financing for the project.  *Id*. at 45.  Accordingly, this portion of the motion is denied.  Mr. Wester is permitted to testify as to opinions 6, 7, 8, and 9.

### d. Opinion 10

Finally, EZAuto seeks to exclude opinion 10:

- Opinion 10: The Mathieu Report does not disclose what method(s) were considered in determining an applicable discount rate and why the selected method was used.  The discount rates employed include subjective components related to risk premiums and additional risk premiums.  The returns calculated in the Mathieu Report related to including the +CP product type in damages (Scenarios 2 and 4) significantly outweigh the risk adjustments incorporated in the discount rate.

Docket No. 180 at 10-11; Docket No. 180-1 at 5.  EZAuto argues that Mr. Mathieu described his theory of discount rates in his report and deposition.  Docket No. 180 at 10-11.  The Court finds that the disagreement over whether Mr. Mathieu used the proper discount rate is proper grounds for rebuttal expert testimony.  However, since plaintiff has removed the HPP+CP damages calculation from Mr. Mathieu's report, Mr. Wester is precluded from offering this opinion with respect to the HPP+CP product.  Accordingly, the Court will exclude opinion 10 in part.

## IV.     CONCLUSION

It is therefore

**ORDERED** that Defendants' Motion *in Limine* to Disallow Plaintiff's Damages

Expert and Barring Plaintiff from Presenting Evidence on Lost Profits [Docket No. 177]

is **DENIED**.  It is further

**ORDERED** that Plaintiff's Motion to Bar Testimony of Matthew Wester [Docket

No. 180] is **GRANTED IN PART** and **DENIED IN PART**.


DATED February 23, 2023.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge